```
Approved:  _____
           ELIZABETH HANFT
           Assistant United States Attorney

Before:    THE HONORABLE ONA T. WANG              21 MAG 304
           United States Magistrate Judge
           Southern District of New York
```

```
- - - - - - - - - - - - - - - - - x
                                   :   SEALED COMPLAINT
UNITED STATES OF AMERICA           :
                                   :   Violations of
          - v. -                   :   15 U.S.C. §§ 78j(b) and
                                   :   78ff; 17 C.F.R. § 240.10b-
                                   :   5; 18 U.S.C. §§ 1343 and 2.
ERIC MALLEY,                       :
                                   :   COUNTY OF OFFENSES:
          Defendant.               :   New York
                                   :
- - - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

  KRISTIN M. ALLAIN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation and charges as follows:

**COUNT ONE**
**(Securities Fraud)**

  1.  From at least in or about 2013, up to and including in or about March 2020, in the Southern District of New York and elsewhere, ERIC MALLEY, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, MALLEY fraudulently induced victims to purchase limited partnership interests in two real estate investment funds by means of misrepresentations and

1

omissions, and continued that pattern of fraudulent misrepresentations and omissions throughout the life of the funds.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

### COUNT TWO
### (Wire Fraud)

2.  From at least in or about 2013, up to and including in or about March 2020, in the Southern District of New York and elsewhere, ERIC MALLEY, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MALLEY, using electronic transfers of funds, email communications, interstate telephone calls, and other wire communications, fraudulently induced his victims to purchase limited partnership interests in two real estate investment funds by means of misrepresentations and omissions, and continued that pattern of fraudulent misrepresentations and omissions throughout the life of the funds.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 3 years.  I am currently assigned to an FBI squad focused on investigating complex white-collar crimes, including securities fraud, commodities fraud, wire fraud, and other financial crimes.  As part of my work at the FBI, I have received training regarding ways in which these crimes are perpetrated, have participated in numerous investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

4.  Since in or about June 2018, I have been investigating ERIC MALLEY, the defendant, and his fraudulent activities in connection with his role as founder and Chief Executive Officer

("CEO") of a real estate private equity investment firm called MG Capital Management L.P. ("MG Capital"), as well as two real estate investment funds for which MG Capital was the asset manager and MALLEY was Managing Member, MG Capital Management Residential Fund III ("Fund III") and MG Capital Management Residential Fund IV ("Fund IV").  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during the course of this investigation, directly or indirectly, from other sources, including:
(a) conversations with, and reports prepared by, other law enforcement agents; (b) information and documents obtained from non-law enforcement witnesses, including former MG Capital employees, investors in Funds III and IV, and individuals currently involved in the liquidation of Funds III and IV; (c) documents and information obtained from banks and other financial institutions; (d) publicly available information, including property and other records; and (e) documents and information collected by the United States Securities and Exchange Commission (the "SEC") in connection with a parallel SEC investigation of MALLEY.  Because this Complaint is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

5.     Based on my participation in this investigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

6.     ERIC MALLEY, the defendant, is a fifty year-old citizen of the United States.  MALLEY has been a licensed real estate agent in New York since in or about 1999.  He previously worked at a luxury international realty company ("Realty Company-1"), among other places.

7.     In or about January 2013, ERIC MALLEY, the defendant, formed MG Capital Management L.P., which MALLEY described as an opportunity for investors to invest, through the purchase of limited partnership ("LP") interests, in Class A residential real estate properties in New York City.  On its website, MG Capital describes itself as a "premier private equity real estate manager that has been investing exclusively in Class A residential properties across Manhattan since early 2000."

Between in or about 2013 and in or about December 2019, MALLEY served as both MG Capital's CEO and its Chief Investment Officer.

8.   During the period from in or about January 2013 up to and including in or about 2017, ERIC MALLEY, the defendant, formed at least two real estate investment funds – Fund III (formed in or about 2013) and Fund IV (formed in or about 2017) (collectively, the "Funds").

9.   As set forth in further detail below, ERIC MALLEY, the defendant, touted the Funds as providing investors with the opportunity to own, through the purchase of LP interests in the Funds, an equity interest in hundreds of luxury income-producing properties across Manhattan, following a debt-free investment strategy informed by sophisticated proprietary analytics MALLEY had developed over the course of his career in real estate. MALLEY further represented, among other things, that the properties would primarily be leased to corporate tenants, including, among others, well-known technology companies and a prominent university based in New York City.  In soliciting investors, MALLEY touted two purportedly extremely successful prior funds he had formed, Fund I and Fund II.  Investors purchased LP interests in Funds III and IV in reliance on MALLEY's claims.

10.  Throughout the life of the Funds, ERIC MALLEY, the defendant, also continued to maintain, among other things, that the Funds were debt-free and that the properties the Funds held were primarily leased to corporate tenants.

11.  In fact, and as further set forth below, these representations by ERIC MALLEY, the defendant, were largely false.  Contrary to his claims that the Funds were debt-free, MALLEY had in fact mortgaged multiple properties held by the Funds, and the vast majority of properties held by the Funds were leased by individuals, rather than corporate tenants, as MALLEY had promised.  Furthermore, MALLEY's representations about the existence and performance of Funds I and II were largely fabricated.

12.  Through these and other fraudulent misrepresentations and omissions, described further below, ERIC MALLEY, the defendant, induced approximately 335 investors to invest in the Funds, including investors who put their entire retirement savings into the Funds.  None of those investors has received

4

their investments back,[1] and both Fund III and Fund IV are currently in the process of being liquidated.

### Funds "I" and "II"

13. Based on my participation in this investigation, and my review of marketing materials provided or caused to be provided by ERIC MALLEY, the defendant, to investors in Funds III and IV, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a. In Fund III marketing materials provided to prospective investors, MALLEY touted his prior funds' success, and stated that MG Capital had a "six-year track record of producing strong ROI." MALLEY claimed, among other things, that he had launched two prior funds, Fund I and Fund II, and that:

        i. MALLEY had "[l]aunched Fund I in 2007, raising $350 million during a 12-month offering period";

        ii. Fund I consisted of approximately 74 individual condominium properties based in Manhattan;

        iii. MALLEY had "[l]aunched Fund II in 2010, raising $55 million during a 30-day offering period";

        iv. Fund II consisted of approximately 19 individual condominium properties based in Manhattan;

        v. The "[a]verage combined annual ROI" for Funds I and II during the period from 2007 to 2012 was "38.33% gross and 29.30% net . . . , compared to S&P 500 returns of 4.69% for the same period."

    b. In documents provided by MALLEY to two online crowdfunding platforms ("Platform-1" and "Platform-2") through which MALLEY solicited investments in Fund IV, MALLEY made similar representations regarding his prior funds' existence and performance. For example:

        i. In a "one-pager" purporting to describe Fund IV, which was provided to Platform-1 and subsequently made available to investors, MALLEY stated that, during the previous

---

[1] Certain investors who have filed civil lawsuits against MALLEY appear to have received at least some portion of their money back through litigation.

5

years, MG Capital's returns had outpaced the S&P 500 index by 4 to 1;

       ii.    In an offering page provided to Platform-2 (the "Offering Page"), MALLEY: repeated the claim that MG Capital's 10-year returns had outpaced the S&P 500 by 4 to 1; stated that Fund I, which had consisted of 74 properties, had been divested for $750 million in cash at the end of 2013; and stated that Fund II had a portfolio of 19 properties valued at $184.2 million as of the end of 2017 and a 2017 annual cash dividend distribution of 12.86%.

    14.    Based on my review of materials produced by MG Capital in response to requests for information relating to, and verification of, the existence and performance of Funds I and II, as well as my review of publicly available records and my conversations with witnesses, it appears that Funds I and II either did not exist, or were nowhere close to the size or performance-level described by ERIC MALLEY, the defendant, to investors.  For example, I have not located among MG Capital's records any documentation regarding properties or investors in, or performance metrics of, Funds I or II, aside from documents summarizing Funds I and II, dated in later years, like the documents described in paragraphs 13(a) and (b) *supra*.[2]

    15.    In addition, based on my conversations with former employees of MG Capital and my review of SEC depositions of former employees, I have learned that those employees did not witness any activity by ERIC MALLEY, the defendant, in connection with Funds I and II.  For example:

    a.    An employee ("Employee-1") who worked at MG Capital from in or about April 2013 until in or about February 2018, who was for a time listed as a "principal" of the firm, had the title of "Managing Director," and appeared to have been primarily responsible for investor relations during that time, told the SEC during Employee-1's deposition that Employee-1 did

---

[2] Based on documents obtained from the Delaware Department of State Division of Corporations, I have learned that MALLEY incorporated an entity called "Malley Group Capital Residential Fund I LP" in Delaware in 2010, approximately three years after the purported launch of Fund I.  That entity does not appear to have produced the returns for Fund I that MALLEY described to investors, nor does its date of incorporation (2010) correspond with the purported launch of Fund I (2007).  I have not located an entity with "Fund II" in the name.

not recall witnessing any activity by MALLEY in connection with Funds I or II during Employee-1's time at MG Capital, despite the fact that at least Fund II was still ostensibly operating after Employee-1 had joined MG Capital;

    b.    Another employee ("Employee-2") who worked in MG Capital's Investor Relations department from in or about February 2016 to in or about April 2019, told the SEC during Employee-2's deposition that Employee-2 had never seen financials for Fund I or Fund II and that, when Employee-2 had asked to see them, MALLEY had informed Employee-2 that the financials were confidential and could only be seen by investors in those funds.  Employee-2 also never received any information regarding properties acquired by Fund I or Fund II.

    c.    A third employee ("Employee-3") who was first an investor in Fund III and Fund IV before becoming MG Capital's Chief Operations Officer in or about May 2019 – and who subsequently became interim CEO of MG Capital in or about December 2019 – has stated that Employee-3 never saw or completed any paperwork related to Fund I or Fund II.  Employee-3 further stated that, when MALLEY began the process of attempting to form a new entity in an initial public offering (the "IPO") to be listed on the London Stock Exchange, MALLEY at first included historical information about Fund I and Fund II in the marketing materials.  According to Employee-3, MALLEY received multiple questions from those involved in the IPO and from employees who were having difficulty substantiating that information.  MALLEY then told Employee-3 that he was having trouble substantiating the information, and that he had therefore removed mention of Fund I or Fund II from the marketing information for the IPO.

## MALLEY's Scheme To Defraud Investors In Connection with Funds III and IV

### Fund III

16.  Based on my participation in this investigation, and my review of marketing materials provided or caused to be provided by ERIC MALLEY, the defendant, to investors in Fund III, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a.    MALLEY began raising money for Fund III in or about 2013.

7

b.     Investor presentations that MALLEY sent to an investor in Fund III ("Investor-1") stated, among other things, that:

    i.     Fund III was to "acquire and manage a well-diversified portfolio of 180-210 residential luxury properties in Manhattan";

    ii.    Fund III would be "unlevered," mitigating risks to investors' principal;

    iii.   Fund III's properties would "[a]ll . . . be rented to . . . long-term corporate tenant partnerships [sic], each with a multi-year lease that includes built-in annual rent escalations between 4.0-10.5%";

    iv.    MG Capital had launched "Fund I" in 2007, raising $350 million during a 12-month offering period; MG Capital had launched "Fund II" in 2010, raising $55 million during a 30-day offering period; and "Fund I" and "Fund II" had "average combined annual ROI of 38.33% gross and 29.30% net . . . during 2007-2012, compared to S&P returns of 4.69% for the same period"; and

    v.     Fund III and/or MG Capital was "[e]xclusive partners with [Realty Company-1] for global marketing."

c.     Based on documents I have reviewed that MALLEY sent or caused to be sent to investors, I have learned that MALLEY informed investors that the target capital raise for Fund III was $525 million.

d.     Based on my review of the Private Placement Memorandum ("PPM") governing Fund III, I know that MALLEY repeated the same claims regarding Fund III, including that;

    i.     Fund III would be "unlevered," and the "General Partner d[id] not intend to cause the Fund to incur any leverage";

    ii.    Fund III sought to acquire and manage 180-210 properties;

    iii.   Fund III's properties were "intended to be well-diversified by location, building and property size"; and

    iv. "Approximately 90% of [Fund III]'s portfolio properties" were intended to be rented to "long-term corporate tenant partnerships."

The PPM also repeated the claims set forth at paragraph 13 *supra* regarding the existence and performance of "Fund I" and "Fund II."

  17. Based on my participation in this investigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a. ERIC MALLEY, the defendant, began raising money for Fund III in or about 2013.  Fund III launched in approximately February 2014.

    b. In total, approximately sixty investors invested approximately $23 million in Fund III – well under the $525 million target capital raise.  Fund III, in turn, acquired only nine units (far short of the between 180 and 210 property target MALLEY had touted), across five different buildings (as well as an apartment already owned and occupied by MALLEY, for which Fund III purchased an option).

    c. Fund III ultimately incurred approximately $860,000 in net operating losses during the period from its launch in or about February 2014 through on or about December 31, 2018.

    d. Contrary to MALLEY's representations, only one of the properties held by Fund III was leased to a corporate tenant not otherwise affiliated with or created by MG Capital.  The majority of Fund III's properties were leased to individuals.

    e. Fund III was also not debt-free or "unlevered."  MALLEY took out mortgages on at least two of the properties held by Fund III, beginning at least in or about April 2015, in exchange for loans secured by the properties from a financial institution ("Financial Institution-1").

    f. Based on my interview with an employee of Realty Company-1, as well as my review of documents produced by Realty Company-1, it appears that neither Fund III nor MG Capital had an exclusive partnership with Realty Company-1 for "global marketing," contrary to the investor presentation described *supra* at paragraph 16(b)(v).

    g. Fund III's investors never received any distributions of net rental income.  Between in or about 2015 and in or about 2017, however, MALLEY caused Fund III to distribute approximately $278,000 to Fund III's General Partner[3] – that is, to MALLEY – although no limited partners had received distributions.  In addition, MALLEY caused Fund III to pay approximately $1.4 million in management fees to MG Capital and approximately $288,000 in property management fees to an entity associated with MALLEY.

<i>Investors in Fund III</i>

  18. Based on my conversations with victims who invested in Fund III, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a. Investor-1 stated that ERIC MALLEY, the defendant, informed Investor-1 that MALLEY owed Investor-1 a favor because Investor-1 had previously invested money with MALLEY for a different venture and had lost money.  MALLEY told Investor-1 that MALLEY could help him make the money back.  MALLEY informed Investor-1, among other things, that:

      i. MALLEY had created prior funds, and was now creating Fund III;

      ii. Fund III was totally unlevered; and

      iii. MG Capital had access to "amazing" corporate leases.

    b. In or about Fall 2013, Investor-1 invested approximately $1 million in Fund III.

    c. Investor-1 never received any distributions from Fund III, nor did he receive his initial investment back.  When Investor-1 asked MALLEY about distributions, MALLEY informed Investor-1 that things were going well and that the following year, Investor-1 would receive distributions.

    d. Investor-1 asked MALLEY many times for a list of the apartments held by Fund III, but Investor-1 never received such a list.

---

[3] Fund III's General Partner consisted of MALLEY and an entity he controlled called Malley Family Investors Trust.

e. It was critical to Investor-1's investment decision that Fund III was unlevered, as MALLEY had represented, because Investor-1 believed that, if real estate had no debt against it, no matter what happened, there would be sufficient rent to pay charges on the properties. Accordingly, Investor-1 believed there would be little risk associated with the investment.

f. Another investor ("Investor-2") invested in total more than $4 million in Fund III. Investor-2 first invested approximately $800,000 in or about March 2016 after MALLEY explained his intentions for Fund III and stated that Fund I and Fund II were successfully in the unwinding phase. Investor-2 stated that, in convincing Investor-2 to invest in Fund III, MALLEY stated, among other things, that the properties were held debt-free and would remain that way. In truth and in fact, as noted above, MALLEY began taking out mortgages on Fund III properties starting in or about April 2015. MALLEY further informed Investor-2 that the properties in Fund III had been or would be leased out to major corporations, and that his biggest tenants were a well-known technology company and a prominent university based in New York City, but that he had approximately eight other similar tenants. At one point, MALLEY informed Investor-2 that he was having difficulty meeting the technology company's demand for real estate. Investor-2 stated that the fact that Fund III was debt-free and that the apartments were rented by corporate tenants was crucial to his decision to invest. MALLEY continued to falsely assert that Fund III was debt-free throughout Investor-2's investment. In or about December 2016, MALLEY persuaded Investor-2 to invest more money in Fund III, which Investor-2 then did, investing an additional $1,200,000. In or about December 2018, MALLEY persuaded Investor-2 to invest an additional $2,190,000, which Investor-2 did. At that time, MALLEY again reiterated to Investor-2 that Fund III was debt-free. As late as September 2019, in an email to Investor-2 soliciting Investor-2's investment in a pre-IPO investment facility for another new fund, MALLEY touted "MG Capital's . . . continued debt-free strategy." Investor-2 never received any distributions from Fund III, nor did he receive his investments back.

g. Employee-3, prior to working at MG Capital, invested approximately $250,000 in Fund III in or about October 2014 (and later invested approximately $150,000 in Fund IV in or about March 2019), an amount which totaled Employee-3's retirement savings. According to Employee-3, before Employee-3 invested, MALLEY told Employee-3 that Fund III was debt-free.

11

Employee-3 stated that the sole reason Employee-3 invested in the Funds was the representation that the Funds were debt-free, because Employee-3 believed that such an investment would preserve any capital invested. Despite working at MG Capital beginning in or about May 2019, Employee-3 did not learn that there was any debt associated with any of the properties in Fund III or Fund IV until Employee-3 became interim CEO in or about December 2019.

<u>Fund IV</u>

19. Based on my participation in this investigation, and my review of marketing materials provided or caused to be provided by ERIC MALLEY, the defendant, to investors in Fund IV, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

    a. MALLEY began raising money for Fund IV in or about 2017 and solicited investors in Fund IV through, among other things, Platform-1 and Platform-2.

    b. In marketing materials for Fund IV, MALLEY maintained that Fund IV would be "debt-free" and would "generate recurring rental income streams for non-cancellable, multi-year leases with MG-AAA rated corporate tenants."

    c. The Offering Page provided to Platform-2, and subsequently made available to investors, stated the following, among other things:

        i. MG Capital "d[id] not utilize mortgages or debt instruments of any kind to execute its acquisition, property management or disposition practice" and the "absence of debt [was] critical to [Fund IV's] performance and uncorrelated returns."

        ii. Fund IV's portfolio properties would "each provide long-term executive housing as mandated by the firm's corporate tenants," drawing on a "diverse roster of ~215 corporate tenant partnerships," including "Fortune 500 firms, financial institutions, pharmaceutical companies, technology firms, advertising agencies, fashion houses, nonprofits, museums, universities and diplomats."

        iii. Properties in Fund IV would be "pre-lease[d]" to the corporate tenants;

        iv.    Fund IV's properties would be located in more than 100 residential buildings across 15 neighborhoods; and

        v.    MG Capital's 10-year returns had outpaced the S&P 500 by 4 to 1. Fund I, which had consisted of 74 properties, had been divested for $750 million in cash at the end of 2013; and Fund II had a portfolio of 19 properties valued at $184.2 million as of the end of 2017 and a 2017 annual cash dividend distribution of 12.86%.

    d.    A "one-pager" purporting to describe Fund IV, which was provided to Platform-1 and subsequently made available to investors, stated the following, among other things:

        i.    Fund IV investors would "own an equity interest in hundreds of income-producing Class A properties across Manhattan";

        ii.    Fund IV would "follow the same debt-free investment strategy as [MG Capital's] three prior funds,";

        iii.    Fund IV's "investors' net invested capital [would be] 100% protected from loss," with the caveat that, among other things, "no assurance can be given that an investor's net invested capital protection will be satisfied or that [the investor] will receive distributions from the fund sufficient to return [the investor's] capital contributions or other payments thereto."

        1.    In marketing materials and emails sent to investors in Fund IV, investors were informed that Fund IV's General Partner maintained "a balance sheet in excess of $250M that could be drawn upon in the unlikely event that an investor's net invested capital commitment was not returned in full at the conclusion of the investment term." In fact, however, Fund IV's General Partner held at most $1,000 at the time those claims were made, and at no point held more than $25,000.[4]

    e.    In documents that MALLEY sent or caused to be sent to investors, MALLEY informed investors that the target capital raise for Fund IV was $250 million.

---

[4] The representations regarding capital protection and the General Partner's balance sheet were eventually removed from Fund IV's marketing materials, but only after Fund IV had raised approximately $3.3 million from investors.

13

    f. In the PPM governing Fund IV, MALLEY repeated similar claims regarding Fund IV, including that:

     i. Fund IV sought to "acquire and manage up to 100 individual . . . properties," located "in more than 100 buildings across 15 prime Manhattan neighborhoods";

     ii. The Fund would operate according to MG Capital's "debt-free strategy," with "no leverage"[5];

     iii. MG Capital was a "leading provider of long-term placement for corporate executives," and sought to "lease approximately 90% of [Fund IV's] portfolio properties to AAA-rated long-term corporate tenant partnerships [sic], which [were] well-diversified across a broad variety of industries";

     iv. MG Capital had a "deep bench of high-quality long-term corporate tenant partnerships with non-cancelable, multi-year lease agreements"; and

     v. MG Capital had launched "Fund I in 2007 [and] Fund II in 2010," and Fund I had been sold to a strategic acquirer as of December 31, 2013 for approximately $750 million, including "all 74 Fund I portfolio properties."

 20. Based on my participation in this investigation, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

---

[5] The Limited Partnership Agreement for Fund IV stated that the "Partnership or any subsidiary thereof may enter into borrowing arrangements, including secured or unsecured credit . . . from time to time," which could be "secured in whole or in part by assets of the Partnership." MALLEY nevertheless continued to maintain, in the documents described herein and in oral and written communications to investors, that Fund IV and MG Capital as a whole would be and was debt-free. On or about May 7, 2019, MALLEY provided to investors an amended PPM, which MALLEY characterized as "clarify[ing] that the portfolio properties may be rented to either corporate or individual tenants" and "provid[ing] more information regarding the Fund's predominantly debt-free strategy and its use of a short-term, nominal bridge facility." By that time, approximately 256 investors had already invested approximately $32 million in Fund IV and the SEC had already subpoenaed MG Capital in connection with its parallel investigation.

      a.    Fund IV launched in or about September 2017.

      b.    In total, approximately 275 investors invested approximately $35 million in Fund IV – well under the $250 million target capital raise.

      c.    Fund IV ultimately incurred millions of dollars in losses during the period from in or about September 2017 through in or about December 2019.

          i.    ERIC MALLEY, the defendant, did not disclose those losses to investors until in or about November 2019, when Fund IV distributed a first set of unaudited financial statements.

      d.    Despite claims by MALLEY that Fund IV intended to acquire properties in more than 100 buildings across 15 neighborhoods, Fund IV's properties consisted of only eight units, located in only two different buildings.

      e.    Also contrary to representations MALLEY made to investors, none of the properties held by Fund IV was leased to a corporate tenant not otherwise affiliated with or created by MG Capital, let alone "pre-leased." In fact, the majority of Fund IV's properties were advertised on the market and leased to individuals.

      f.    Also contrary to representations MALLEY made to investors, Fund IV was not debt-free or "unlevered." MALLEY took out a mortgage on one of the properties held by Fund IV on or about July 10, 2019, in exchange for another loan secured by the property.[6]

      g.    Also contrary to representations MALLEY made to investors, the leases governing Fund IV properties did not all contain non-cancellable long-term leases with annual rent escalations, as MALLEY had represented. At least three of the properties had leases with no annual rent escalations. Two of the properties appear to have been rented only to entities related to MG Capital.

---

[6] As noted *supra* at paragraph 18(f), as late as September 2019, in an email to Investor-2 soliciting Investor-2's investment in a pre-IPO investment facility for another new fund, MALLEY touted "MG Capital's . . . continued debt-free strategy."

*Investors in Fund IV*

21.  Based on my interviews with victims who invested in Fund IV, as well as the sources listed in paragraph 4 *supra*, I have learned the following, in substance and in part:

   a.   An investor ("Investor-3") invested $250,000 in Fund IV in or about October or November 2017, after learning about Fund IV through either Platform-1 or Platform-2.  Through MG Capital's offering documents and representations on its website and crowdsourcing websites, Investor-3 also learned about Funds I and II.  According to Investor-3, the representations made in documents offered on Platform-1 and Platform-2 that Fund IV was intended to be debt-free were a primary reason for Investor-3's investment.  In addition, it was material to Investor-3's investment decision that Fund IV's properties were purportedly "pre-leased" to corporate tenants for long leases.  Investor-3 has not received any of his original investment in Fund IV back.

   b.   Another investor ("Investor-4") invested approximately $140,000 in Fund IV in or about January 8, 2018.  Investor-4 believed, based on marketing and other communications from MG Capital, that Fund IV was unleveraged, that the fund was the third or fourth fund MG Capital had offered, and that the tenants of the properties would be executives with three-year leases guaranteed by the companies for which they worked.  Investor-4 stated that he would not have invested in Fund IV if he had known that Fund IV was not debt-free.  Investor-4 has not received any of his original investment in Fund IV back.

<u>MALLEY Learns of the SEC Investigation and Deletes Files</u>

22.  Based on my participation in this investigation, I know that, by in or about October 2019, the SEC had sent a subpoena for documents and testimony to ERIC MALLEY, the defendant.  In or about mid-December 2019, a few days before he was deposed by the SEC, MALLEY stepped down from his role as CEO of MG Capital, and Employee-3 became the interim CEO to help liquidate the Funds' properties.  Based on my conversations with Employee-3, I have learned that, not long thereafter, MALLEY came to Employee-3's office and stated the following, in substance and in part, to Employee-3:

   a.   The SEC was looking into MALLEY;

   b.   The marketing materials were not MALLEY's doing;

16

      c.   Employee-1 had worked on the marketing materials and had "pushed" MALLEY to make the materials more elaborate; and

      d.   MALLEY had never wanted to work on discretionary funds, but only non-discretionary funds.

23.   Based on my participation in this investigation, I know that Fund III and Fund IV are currently in the process of being liquidated, as managed by an outside advisor hired in or about February 2020.

24.   Based on my interviews with, and my review of a report prepared by, a forensic accountant hired by that outside advisor, I have learned that, between in or about February 2020 and on or about March 31, 2020, ERIC MALLEY, the defendant, accessed MG Capital's server and deleted approximately 10,000 files from the server, files which included, among other things, broker information and closing documents detailing the closing costs associated with acquisition of properties, which were used to obtain funding from the Funds' administrators.

WHEREFORE, I respectfully request that an arrest warrant be issued for ERIC MALLEY, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                                         S/ Kristin M. Allain /otw   Cred. No. 27394
                                          KRISTIN M. ALLAIN
                                          Special Agent
                                          Federal Bureau of Investigation

Sworn to before me this
11th day of January 2021

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK